UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHRISTOPHER HOPKINS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-04-1884 |
| | § | |
| TEXAS MAST CLIMBERS, L.L.C., *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case brought under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, (FLSA) was tried to the court on October 27, 2005.  The parties consented to the jurisdiction of this magistrate judge for all purposes, including final judgment.

Hopkins contends that defendants violated the FLSA by not paying him overtime.  Defendants contend that Hopkins is exempt from the overtime requirements of the FLSA pursuant to 29 U.S.C. § 213(b)(1).  In the alternative, defendants argue that overtime should be calculated based on the fluctuating workweek calculation method set forth in 29 C.F.R. § 778.114.[1]  Based on the

---

[1]     At the conclusion of evidence, the court granted the parties leave to file post-trial briefing. The parties were instructed to file simultaneous post-trial briefs on or before November 11, 2005.  Plaintiff was directed to include in his brief evidence and argument in support of an award of attorney's fees.  Defendants were given until November 18, 2005 to respond to the request for attorney's fees *only*.  This limitation was expressly stated in the minute order from the trial (Dkt. 43).  Defendants filed an untimely reply brief on November 19, 2005 attacking plaintiff's damages calculation.  Because the reply brief disregards the court's instructions, the court will disregard the reply brief, which offers no new argument or
(continued...)

evidence presented at trial and applicable law, the court makes the following findings of fact and conclusions of law.[2]

## I.   <u>FINDINGS OF FACT</u>

1.   Defendant William F. Mims, Jr. is the sole owner of defendant Mast Climbers Manufacturing, Inc. d/b/a American Mast Climbers (collectively "Mast Climbers"). Mims also owns Texas Mast Climber L.L.C., a holding company that owns equipment used by Mast Climbers.

2.   Mast Climbers rents and assembles elevating work platforms, scaffolding, mast climbing platforms, hoists, and various construction equipment.

3.   Defendant AMS Staff Leasing handles payroll functions for Mast Climbers. Although AMS is the name that appears on Hopkins's checks, Hopkins has never talked to anyone with AMS and does not know where the company is located. AMS had no control over Hopkins's work.

---

[1]      (...continued)
authority in any event.

In addition, defendants' post-trial briefing relies on evidence not admitted at trial, specifically the results of a wage and hour investigation conducted by the Department of Labor. The court does not consider the Department of Labor investigation in reaching its decision.

[2]      To the extent any item designated as a finding of fact is actually a conclusion of law, it is adopted as such and vice versa.

2

4.      Hopkins worked for Mast Climbers from April 16, 2003 through June 18, 2003 and again from September 23, 2003 through April 3, 2004, a total of 37 weeks. Hopkins's primary job responsibility was to erect and dismantle scaffolding, hoists, and related equipment.  He worked on various construction projects in Texas and Louisiana.

5.      Mast Climbers' scaffolding equipment was kept at its "yard" in Fort Worth for delivery by truck to job sites.  Sometimes equipment was trucked from one job site to another without returning to Fort Worth.

6.      Mims worked, and during the period at issued lived, out of Mast Climbers' office in Fort Worth.  Mims was not on the job sites all the time, and in fact at times did not know where Hopkins was working.  He saw Hopkins on average once or twice a month.

7.      Hopkins, a Houston resident, was rarely in Fort Worth.  For that reason, it was not a usual part of his job to load trucks with scaffolding equipment for delivery to a job site.  A daily work report indicates that Hopkins assisted with loading 8 ½' tie-pipes onto a pickup truck at the Fort Worth facility on March 3, 2004.  That truck was driven to a job site in Dallas.  That is the only evidence in the record of Hopkins performing loading activities at the Fort Worth equipment yard.

8.      Hopkins worked as part of a two-man crew with his supervisor, Dennis Dan.  Hopkins did not at any relevant time have a driver's license.  Therefore, it was the usual practice for Hopkins to ride to job sites in a pickup truck driven by Dan, who would pick up Hopkins at his residence in Houston.  On two or three occasions Hopkins drove the pick-up truck home from a job site because they had worked long hours and Dan could not stay awake.

9.      Small tools and equipment necessary for the job were transported in the pickup truck.   Dan loaded tools into the truck before picking up Hopkins. Occasionally, equipment such as pipes, a welding machine, or parts and pieces of a tower, would need to be shuttled between job sites using the pickup truck.  Although Mims testified that this was a routine practice, there is no evidence that Hopkins himself ever loaded a pickup truck for this purpose.

10.    Dan and Hopkins filled out time sheets, daily reports, and service and inspection reports to keep track of the work they performed at job sites.  It was Dan's job to make sure these reports were faxed to Mims in Fort Worth.

11.    After completion of a job, the equipment would be loaded for return to the yard or transport to another job site.  Hopkins worked primarily with a Mast Climbers truck driver named Dustin Bushnell, although he recalls working a few times with a driver named Pete.  On a very large job, many trucks might be required

4

to remove all of the equipment from the job site.  In that case, Mims would hire a commercial trucking company.

12.     Loading a truck at a job site was a three man operation.  Dan was responsible for driving the forklift and putting the equipment on the truck.  The truck driver, usually Dustin, would supervise and ensure proper placement of the equipment.  Hopkins would assist by moving the equipment for Dan to pick up and by directing traffic.  On the few occasions when Hopkins assisted in loading a truck after a job was completed, he placed equipment on the truck at the direction of the truck driver and exercised no discretion.  Mims acknowledged that during the time Hopkins worked with Dan, it was Dan's responsibility to know how to load the trucks.

13.     Mims was not routinely on the job site with Dan and Hopkins.  His knowledge of what went on at the job site is based on his review of the daily reports.  Mims does not have any personal knowledge of how or by whom trucks were loaded at job sites in Louisiana.

14.     Mims was present for the tear-down of a very large job in the Houston area known as Intrepid Stone.  Mast Climbers' equipment was on that job site for approximately 18 months.  During the tear-down, which lasted 4 or 5 days, Mims personally drove the forklift to load the trucks.  He recalls Hopkins working

5

alongside him, but Hopkins did not drive the forklift or actually place equipment on a truck during that job.

15.    Dan stopped working for Mast Climbers less than 30 days before Hopkins was terminated.  After Dan left, Hopkins worked with Adam Martin.  Again, because Hopkins did not have a driver's license, Martin drove the pickup truck and took over the job of faxing time sheets and daily reports to Fort Worth.  Hopkins was the senior member of the crew, but was never actually promoted to supervisor.  There is no evidence that Hopkins loaded a truck, either at a job site or in Fort Worth, during the brief period of time after Dan left Mast Climbers and Hopkins was terminated.

16.    Mims acknowledged that it was not unusual for Hopkins to work in excess of 50 hours per week.  If a job was out of town, the crew would work long hours for as many days as necessary to get the job done and head home.  Hopkins generally worked six days per week and took off very few days.  Hopkins estimates he worked an average of 65 hours per week during his 37 weeks of employment.  Mast Climbers offered no evidence to the contrary.

17.    Records produced by Mast Climbers indicate that Hopkins worked over 40 hours in at least 20 of those weeks.  However, there are many days unaccounted for by Mast Climbers' records.  Hopkins testified that he worked several days for

6

which there are no time records, including six hours on December 25, 2004. Hopkins did not keep copies of his time sheets, and therefore cannot remember exactly which days he worked. Hopkins found three time sheets covering the weeks from March 8 through March 28, 2004 in the pickup truck after his termination on April 3, 2004, which he produced to counsel but which were not produced by Mast Climbers. Mims did not handle any payroll functions and does not know why there are gaps in the records.

18.     For the nine-week period from April 16, 2003 through June 18, 2003, Mast Climbers paid Hopkins $866.67 twice a month. For the 21-week period from September 23, 2003 through February 15, 2004, Mast Climbers paid Hopkins $960.00 twice a month. For the seven-week period from February 16, 2004 through April 3, 2004, Mast Climbers paid Hopkins $1,083.33 twice a month. Mast Climbers paid Hopkins the same amount no matter how many hours he worked in a week.

19.     Before he was hired on April 16, 2003, Dan told Hopkins that he would be paid between $430 and $450 per week, based on a 40 hour workweek. There was no discussion of overtime.

20.     Hopkins was given an employee handbook when he was initially hired by Mast Climbers. The handbook indicates that work-time for field personnel was from 6:00 am until 3:30 pm, Monday through Friday, with 30 minutes for lunch.

7

Employees were also expected to be on call on weekends on a rotating basis. Weekend hours for on-call employees were Saturday from 6:00 am until noon, with longer hours in case of an emergency. The handbook does not contradict Hopkins's assertion that his salary was intended to cover a 40 hour workweek.

21.     Before starting work the second time, Hopkins talked to Dan about his salary and hours. Dan offered Hopkins more money to return to work. Even though he had worked more than forty hours per week during his first period of employment, Hopkins believed Dan when he said that Hopkins would be paid based on a 40 hour week,[3] and that overtime was not expected. Hopkins accepted the offer to return to employment with Mast Climbers because he needed the money and enjoyed the work. Mims never spoke with Hopkins about his salary or overtime, and does not know what was said in the conversations between Hopkins and Dan. Dan did not testify at trial.

22.     Hopkins's last day of work for Mast Climbers was April 3, 2004.

---

[3]     Although Mast Climbers disputed at trial that Hopkins was paid based on a 40 hour week, Mast Climbers submitted as part of the Joint Pretrial Order a proposed finding of fact that for each period of employment Hopkins was paid a salary on a semi-monthly basis that equated to a specific hourly rate "for a forty-hour work week." Defendants' proposed findings of fact and conclusions of law (Dkt. 39), ¶ 13.

## II.    CONCLUSIONS OF LAW

1.    The FLSA provides that employers must pay covered employees extra compensation of at least one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week.  29 U.S.C. § 207(a)(1).  The reach of the FLSA is broad, but not unlimited.  *Cleveland v. City of Elmendorf*, 388 F.3d 522, 526 (5th Cir. 2004).

### A.    Hopkins's Employer

2.    Under FLSA § 203(d):

'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization.

3.    An employee may have one or more employers for purposes of the FLSA.  In determining whether a person or corporation is an "employer" for purposes of the act, the court should consider the total employment situation, with particular regard to (1) whether the employment takes place on the premises of the company; (2) how much control the person or company exerts over the employee; (3) whether the person or company has the power to fire, hire, or modify the employment terms and conditions; (4) whether the employee performs a "specialty job" within a

9

production line; and (5) whether the employee may refuse to work for the person or company and work for others. *Wirtz v. Lone Star Steel Co.*, 405 F.2d 668, 669-70 (5th Cir. 1968).

4.      There is no dispute in this case that Mast Climbers (including Mims) was Hopkins's employer.  The court concludes that neither Texas Mast Climber L.L.C. nor AMS was Hopkins's employer for purposes of the FLSA. The former is merely a holding company that leases equipment to Mast Climbers, while the latter provides staffing and payroll services; neither exercised control over Hopkins's employment.

## B.      Section 213(b)(1) Exemption

5.      Certain employees are exempt from FLSA coverage.  The employer bears the burden to prove that an employee is exempt, and "exemptions are to be narrowly construed against the employer." *Cleveland*, 388 F.3d at 526.

6.      At issue in this case is the exemption for any employee whom the Secretary of Transportation (Secretary) has the "power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1).  In order for this motor carrier exemption to apply, it does not matter if the Secretary has actually established qualifications and maximum hours of service, but only whether the Secretary has the power to do so.  29 C.F.R. § 782.1; *Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47-48 (1943).

10

7.     The Secretary's authority to prescribe qualifications and maximum hours extends only to employees that transport passengers or property in interstate commerce whose activities affect the safety of operation of vehicles on the highways of the country.  49 U.S.C. § 13501; *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 671 (1947).

8.     The Department of Transportation has found that the activities of "loaders" directly affect the safety of operation of motor vehicles in interstate commerce.  *Levinson*, 330 U.S. at 669.  "Loaders" are employees whose "sole duties are to load and unload motor vehicles and transfer freight between motor vehicles and between vehicles and the warehouse."  *Id.* at 652 n.2 (citing an Interstate Commerce Commission ruling).

9.     In *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 706 (1947), the Supreme Court held that loaders may be exempt from the FLSA if their activities consist of work defined by ICC ruling as that of a "loader," and as affecting the safety of operation of motor vehicles in interstate or foreign commerce.  Remanding for additional fact-finding, the Court elaborated further:

> [T]he District Court shall not be concluded by the name which may have been given to [an employee's] position or to the work that he does, nor shall the District Court be required to find that any specific part of his time in any given week must have been spent in those activities.  The District Court shall give particular attention to whether or not the

activities of the respective respondents included that kind of 'loading' which is held by the Commission to affect safety of operation.   In contrast to the loading activities in the Levinson case, the mere handling of freight at a terminal, before or after loading, or even the placing of certain articles of freight on a motor carrier truck may form so trivial, casual or occasional a part of an employee's activities, or his activities may relate only to such articles or to such limited handling of them, that his activities will not come within the kind of 'loading' which is described by the Commission and which, in its opinion, affects safety of operation.

*Id.* at 707-08 (citation omitted).

10.     The Fifth Circuit has characterized *Pyramid* as establishing a *de minimis* rule.  An employee is not exempt from the overtime provisions of the FLSA if his work affecting highway safety is only "trivial, casual, occasional and insubstantial." *Wirtz v. Tyler Pipe and Foundry Co.*, 369 F.2d 927, 930 (5th Cir. 1966); *Mitchell v. Meco Steel Supply Co.*, 183 F. Supp. 777, 779 (S.D. Tex. 1956) (while employee's duties from time to time included assisting with the loading and unloading of trucks, his connection with such activities was so casual and inconsequential as not to bring him within the exception to the FLSA).

11.     In addition, federal regulations provide that:

[A]n employee who has no responsibility for the proper loading of a motor vehicle is not within the exemption as a 'loader' merely because he furnishes physical assistance when necessary in loading heavy pieces of freight, or because he deposits pieces of freight in the vehicle for someone else to distribute and secure in place, or even because he does the physical work of arranging pieces of freight in the vehicle where

12

another employee tells him exactly what to do in each instance and he
is given no share in the exercise of discretion as to the manner in which
the loading is done.

29 C.F.R. § 782.5(c).

12.    Applying these standards to the facts of this case, the court concludes

that Mast Climbers has not met its burden to prove that Hopkins was exempt from

overtime under the FLSA motor carrier exemption.  Hopkins's loading activities were

a *de minimis* part of his job under the principles established in *Pyramid*.  Hopkins's

testimony on this score was credible, and uncontradicted by any eyewitness

testimony. In addition, there is no evidence that any truck loaded by Hopkins traveled

interstate.  Therefore, the motor carrier exemption of 29 U.S.C. § 213(b)(1) does not

apply.

13.    Hopkins has clearly met his burden to show an overtime violation of the

FLSA.  There is no dispute that he worked more than 40 hours in a workweek, and

that he was not paid the statutory premium for those overtime hours.

**C.    Computing Unpaid Overtime**

14.    Mast Climbers failed to maintain time or payroll records accurately

reflecting the number of hours actually worked by Hopkins, in violation of 29 U.S.C.

§ 211(c).

13

15.     When an employer has failed to maintain accurate payroll records, the employee's initial burden is to make out a prima facie case that the FLSA has been violated and to produce some evidence to show the amount and extent of the violation. *Beliz v. W. H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330 (5th Cir. 1985) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)). This is not a heavy burden.  The employee meets his burden if he produces sufficient evidence, which may consist of his own credible testimony, to show the amount of work by "reasonable inference."  The evidence may be inexact or approximate.  The burden then shifts to the employer to present evidence of the actual hours the employee worked to contradict the employee's evidence. *Id.* at 1330-31.

16.     Hopkins testified based on his recollection that he worked on average 65 hours per week.  Mast Climbers introduced no evidence to contradict this estimate. In fact, Mast Climbers' evidence is fairly consistent with Hopkins's estimate.  Mast Climbers' time records are incomplete, but the records that do exist show that he worked over 40 hours in 20 of his 37 weeks of employment.  Hopkins worked over ninety hours each of the first two weeks of January, 2004, and over eight-six hours the week of March 8, 2004.  Mims testified that it was not unusual for Hopkins to work more than 50 hours per week, and that while he sometimes worked less, he sometimes worked a lot more.

14

17.     The court credits Hopkins's testimony regarding the number of hours he worked.  The court will assume 25 hours of overtime for each of the 37 weeks of Hopkins's employment in calculating his overtime pay.

18.     The FLSA requires that overtime must be compensated at a rate not less than one and one-half times the "regular rate" at which the employee is actually employed. 29 U.S.C. § 207(a); 29 C.F.R. § 778.107.  The "regular rate" is the employee's hourly rate as determined "by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the **total number of hours actually worked** by him in that workweek **for which such compensation was paid."** 29 C.F.R. § 778.109 (emphasis supplied).

19.     Hopkins was paid on a salary basis rather than an hourly basis.  In order to compute overtime pay in such a case, it is necessary to convert the salary to an hourly rate.  If the salary is paid weekly, the employee's regular rate of pay is computed "by  dividing the salary by **the number of hours the salary is intended to compensate."** 29 C.F.R. § 778.113(a)(emphasis supplied).  If, as in Hopkins's case, the salary is paid semi-monthly, the salary must first be "translated into its weekly equivalent by multiplying by 24 and dividing by 52." 29 C.F.R. § 778.113(b). Once the weekly wage is determined, the regular hourly rate is calculated as indicated in  § 778.113(a).

15

20.    The key factor in figuring the hourly rate for salaried employees is determining "the number of hours the salary is intended to compensate." 29 C.F.R. § 778.113(a).  Mast Climbers contends that there was a clear mutual understanding that the salary paid to Hopkins was intended to compensate him for all hours worked each workweek, whatever their number.   This is known as the "fluctuating workweek" method,  described at 29 C.F.R. § 114(a).  This method of calculating unpaid overtime is generally advantageous to the employer for two reasons:  (a) the regular hourly rate is reduced, because the number of covered hours is greater than 40; and (b) the **unpaid** overtime premium is only 50% of the regular hourly rate, because all hours (including overtime hours) have already been compensated at the straight time rate.

21.    Because the fluctuating workweek is neither a defense nor an exemption to the FLSA, the employee has the burden of proving that the method does not apply to his case. *Samson v.  Apollo Resources, Inc.,* 242 F.3d 629, 636 (5th Cir. 2001). This is but another way of saying that the employee has the burden to prove his damages by establishing the number of hours his salary was intended to cover. Unless the employee establishes that his salary was supposed to cover some fixed,

lesser number of hours, the salary will be presumed to cover all hours actually worked.[4]

22.    Hopkins has met his burden of showing the fluctuating workweek method is not applicable here.  There was no clear mutual understanding that the salary paid to Hopkins was intended to compensate him for all hours he was called upon to work in a workweek, whether few or many.  Hopkins testified without contradiction that his supervisor told him, both when he was hired and when he was rehired, that he would be paid a salary based on a 40 hour workweek.  Unlike in *Samson*, there is no evidence in this case that Mast Climbers had consciously adopted the fluctuating workweek method in advance, or that anyone from Mast Climbers ever explained the fluctuating workweek policy to Hopkins.  The employee handbook did indicate that more than 40-hours might be required in a week, but it did not address whether the salary was intended to cover all hours worked, or how the employee would be compensated for overtime hours.  There simply is no basis to conclude that Hopkins clearly understood that his salary was to compensate him for all hours worked in any given workweek.

---

[4]    Of course, the resulting rate must not be less than the statutory minimum wage. *See* 29 C.F.R. §§ 778.113(b), 778.114(a).

17

23.     Because the fluctuating workweek standard does not apply, the court calculates Hopkins's damages on the assumption that his salary was based on a 40 hour workweek, and that he has not received any straight time compensation for overtime hours.  During his first period of employment, Hopkins was paid $866.67 semi-monthly for 9 weeks.  This results in an hourly rate of $10.00.[5]  Because Hopkins worked 25 hours of overtime each week, he is entitled to overtime compensation of $3,375.00 for this period.[6]  Using the same calculation method, Hopkins is entitled to overtime compensation of $8,720.25 for the period he was paid $960.00 semi-monthly, and $3,279.50 for the period he was paid $1,083.33 semi-monthly.[7]  Therefore, Hopkins will be awarded overtime compensation of $15,374.75.

---

[5]     To arrive at an hourly rate, one multiples $866.67 by 24, divides the result by 52 to arrive at a weekly salary of $400, and divides by 40 hours to determine the hourly rate of $10.00.

[6]     25 hours per week multiplied by 9 weeks equals 225 total overtime hours, which sum is multiplied by 15, or 1.5 times the $10.00 hourly rate, to reach $3,375.00.

[7]     Hopkins's hourly rate when he made $960.00 semi-monthly was $11.07.  525 overtime hours (25 multiplied by 21 weeks), at $16.61 per hour ($11.07 multiplied by 1.5), totals $8,720.25.

Hopkins's hourly rate when he made $1,083.33 semi-monthly was $12.49.  175 overtime hours (25 multiplied by 7 weeks), at $18.74 per hour ($12.49 multiplied by 1.5), totals $3,279.50.

18

D.      **Liquidated Damages**

24.      A successful FLSA plaintiff is entitled to liquidated damages equal to the amount of actual damages.  29 U.S.C. § 260.  The court has discretion to reduce the amount of liquidated damages only if the employer meets its burden to prove it acted in good faith in deciding how to pay plaintiff.  *Id.*; *Reich v. Tiller Helicopter Servs., Inc.*, 8 F.3d 1018, 1031 (5th Cir. 1993).  The employer's burden is a substantial one.  *Singer v. Waco*, 324 F.3d 813, 823 (5thCir. 2003).

25.      Mast Climbers has not met its burden to prove that it acted in good faith when it failed to pay Hopkins overtime.  Mast Climbers argues that it relied on a subsequent Department of Labor ruling that erectors were exempt employees in deciding not to pay overtime.  This argument fails first because the results of that investigation are not in evidence.  However, even if such evidence had been admitted, the investigation did not begin until less than one month before Hopkins was terminated, and the results were not known until well after Hopkins was terminated.  Thus, Mast Climbers could not have relied on the investigation in determining how to pay Hopkins.  Mast Climbers offered no other explanation for its decision not to pay overtime.  Hopkins will be awarded $15,374.75  as liquidated damages.

19

### E.    Attorney's Fees and Costs

26.    Hopkins is the prevailing party in this case.  As such, he is entitled to an award of attorney's fees and costs pursuant to 29 U.S.C. § 216(b).  An award of reasonable attorney's fees is mandatory under the FLSA.  *Singer*, 324 F.3d at 829 n.10; *Weisel v. Singapore Joint Venture, Inc.*, 602 F.2d 1185, 1191 n.18 (5th Cir. 1979).

27.    The court applies the lodestar method in calculating attorney's fees. *Singer*, 324 F.3d at 829.  The lodestar is calculated by multiplying the reasonable number of hours expended by an appropriate hourly rate.  *Id.*  The court then considers whether an increase or decrease from the lodestar is warranted based on the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).  *Id.*  Those factors are:  (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee; (6) the fee being fixed per hour; (7) the time limitations imposed by the client and the circumstances; (8) the amount involved and the likely results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) the attorney's fees awarded in similar cases.  *Johnson*, 488 F.2d at 717-19.  The fee

award is not limited by a contingent fee agreement.  *Blanchard v. Bergeron*, 489 U.S.

87, 92094 (1989).

28.     The billing rate of lead counsel, Daniel W. Jackson, is $225.00 per hour.

The billing rate for Jackson's associates is $125.00.   These are reasonable rates for

this type of case in Houston, Texas.  Mast Climbers concedes this point.

29.     Counsel spent a total of 178.70 hours on this case, which was filed on

May 7, 2004 and tried on October 27, 2005.  This includes  successfully defending

against defendants' motion for summary judgment.  Counsel engaged in significant

discovery, including deposing Mims and defending the deposition of Hopkins,

propounding and answering written discovery, and undertaking third party document

discovery from two Mast Climbers' clients.   A review of the billing summary

submitted by counsel indicates that the majority of work was performed by Jackson,

with little or no duplication of effort by associates.[8]  The court concludes that 178.70

hours is a reasonable number of hours to expend in the successful prosecution of this

case.

30.     Hopkins does not seek an upward adjustment from the lodestar.  Mast

Climbers agrees that plaintiff's counsels' billing rates are reasonable and makes no

---

[8]     Jackson worked 134.90 hours, associate Amanda Bedford worked 42.80 hours, and associate
        Joseph Ruiz worked 1 hour.

specific objection to the number of hours expended in this case.[9]   The court concludes that Hopkins is entitled to an award of a reasonable attorney's fees of $35,827.50.

31.    The evidence also established that Hopkins incurred costs of $3,855.87. These costs are comprised of postage charges, fax charges, copying costs, computerized research fees, messenger services, process server charges, and court reporter fees.  Again, Mast Climbers makes no objection to the costs and based on counsel's affidavit the court concludes that they were reasonable and necessary. Hopkins will be awarded costs in the amount of $3,855.87.

## III.   CONCLUSION

For the reasons stated above, the court concludes that Hopkins is entitled to judgment against Mast Climbers, jointly and severally, for $15,374.75 in unpaid overtime, $15,374.75 as liquidated damages, and $39,683.37 as reasonable attorney's fees and costs.

The court will issue a separate final judgment.

Signed at Houston, Texas on December 14, 2005.

Stephen Wm Smith
United States Magistrate Judge

---

[9]    Mast Climbers asserts only that had plaintiff's counsel had a lower opinion of his client's chances of success, they could have possibly settled the matter without a trial.

22